AO 91 (Rev. 11/11) Criminal Complaint

AUSA Georgia N. Alexakis (312) 353-8897

**FILED**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MAY X 4 2015
MAY 4 2015
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

RUVEN VILLARIAL, aka "El Bale,"
GUSTAVO PERALES, and
MIGUEL GONZALEZ

CASE NUMBER:

**15CR 253**

MAGISTRATE JUDGE ROWLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 2, 2015, at Lemont, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | did conspire to knowingly and intentionally possess with intent to distribute a controlled substance, namely 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

DOUG ISACSON
Special Agent,
Homeland Security Investigations (HSI)

Sworn to before me and signed in my presence.

Date: May 4, 2015

_Judge's signature_

City and state: Chicago, Illinois

MARY M. ROWLAND, U.S. Magistrate Judge
_Printed name and Title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

Ss

## AFFIDAVIT

I, DOUGLAS E. ISACSON, being duly sworn, state as follows:

1.     I am a Special Agent with Homeland Security Investigations, and have been so employed for approximately six years. My current responsibilities include the investigation of narcotics trafficking offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that RUVEN VILLARIAL, a/k/a "El Bale," GUSTAVO PERALES, and MIGUEL GONZALEZ have violated Title 21, United States Code, Section 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging VILLARIAL, PERALES, and GONZALEZ with conspiring to knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, a review of consensually recorded

conversations, and my training and experience as well as the training and experience of other law enforcement agents with whom I have spoken.

## FACTS SUPPORTING PROBABLE CAUSE

4.     Beginning on or about April 20, 2015, and continuing through May 2, 2015, VILLARIAL, PERALES, and GONZALEZ coordinated with undercover law enforcement officers to purchase multiple kilograms of cocaine. On or about May 2, 2015, at approximately 2 p.m., after seeing the kilograms of cocaine that undercover law enforcement officers were prepared to provide them, VILLARIAL, PERALES, and GONZALEZ gave undercover law enforcement officers approximately $120,330 and took possession of approximately 6 kilograms of cocaine.

***On or about April 20, 2015, and April 22, 2015, PERALES Approaches UC-1 To Discuss a Potential Narcotics Transaction.***

5.     On or about April 20, 2015, an undercover law enforcement officer ("UC-1") based in or around El Paso, Texas, received a phone call from an unidentified male, later identified as GUSTAVO PERALES, using telephone number (575) 263-XXXX ("Perales Phone").[1] According to UC-1 and a consensual

---

[1] Law enforcement identified preliminarily PERALES based on the following: During the April 20, 2015, telephone conversation described in ¶ 5, UC-1 agreed to meet the user of the Perales Phone on April 22, 2015, at the Bassett Center Mall, 6101 Gateway Boulevard West, El Paso, Texas. At the agreed-upon meeting date and time, law enforcement observed two individuals arrive at the Bassett Center Mall in a gray 2007 Chevrolet truck bearing New Mexico license plate number 234SWY, and meet with UC-1. According to law enforcement databases, New Mexico license plate number 234SWY is registered to GUSTAVO PERALES, 413 West 1st Street, Lovington, New Mexico. Law enforcement retrieved a photograph of GUSTAVO PERALES from law enforcement databases, and UC-1 identified the individual in the photograph as the individual that UC-1 met with on or about April 22, 2015, at the Bassett Center Mall in El Paso, Texas. In addition, according to UC-1, he recognized the voice of one of the individuals he met with on or about April 22,

recording of UC-1's conversation with PERALES, PERALES told UC-1 that he was interested in working with UC-1 to transport a large quantity of cocaine to Houston, Texas, where the cocaine would be sold to Houston-based associates of PERALES.[2] PERALES and UC-1 agreed to meet on April 22, 2015, at the Bassett Center Mall, 6101 Gateway Boulevard West, El Paso, Texas, to discuss such a transaction further.

6. On or about April 22, 2015, at approximately 8:40 p.m.,[3] UC-1 and a second undercover law enforcement officer ("UC-2") met with PERALES and an associate of PERALES identified only as "Rogelio," at the Bassett Center Mall, 6101 Gateway Boulevard West, El Paso, Texas. This meeting was consensually audio-recorded. According to UC-1, UC-2, and the audio-recording, during this meeting:

---

2015, at the Bassett Center Mall in El Paso, Texas, as the voice of the user of Perales Phone. Law enforcement confirmed PERALES's identity following his May 2, 2015, arrest.

[2] This affidavit references consensually recorded telephone calls and meetings. The participants in these consensually recorded telephone calls and meetings spoke in Spanish. Any synopses of, and language quoted from, these recorded conversations that are included in this affidavit are based on draft summaries, not final transcripts, prepared by Spanish-speaking law enforcement agents. The descriptions of the recorded conversations included in this affidavit do not reference all of the topics covered during a particular recorded conversation. In addition, the descriptions of the recorded conversations included in this affidavit do not include references to all statements made by the speakers on the topics that are described by the speakers. In many of the paragraphs describing recorded conversations, interpretations of the discussions are included in brackets or otherwise. These interpretations include meanings attributed to code words, coded language, or vague references used by the speakers. My understanding and interpretation of the conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, my knowledge derived from this investigation, other law enforcement agents with whom I have spoken, and my experience and familiarity with narcotics trafficking organizations.

[3] All times are in CST.

a.     UC-1, UC-2, PERALES, and Rogelio discussed a potential narcotics transaction in which UC-1 and UC-2 would provide PERALES, Rogelio, and unidentified associates of PERALES with several kilograms of cocaine.

b.     PERALES and Rogelio said they were associated with an organization responsible for distributing large amounts of cocaine in and around Houston, Texas; that they had been engaged in drug trafficking for approximately 10 years; and that they were well-versed in drug trafficking operations.

c.     Rogelio said that his and PERALES's prior source of supply for narcotics had been arrested recently; that since that source's arrest, Rogelio and PERALES had been experiencing difficulty procuring a sufficient supply of cocaine; and that PERALES and Rogelio were looking for a new source of supply.

d.     UC-1 asked PERALES and Rogelio how many kilograms of cocaine they were attempting to procure. In response, Rogelio said approximately 30 kilograms. UC-1 told Rogelio that UC-1 was not comfortable supplying such a large amount of narcotics in a first-time transaction. Rogelio then asked what amount of narcotics UC-1 would be comfortable supplying, and UC-1 responded that he was authorized by his "bosses" to sell 10-15 kilograms of narcotics in a first-time transaction. UC-1 added that if UC-1's first transaction with PERALES and Rogelio took place without incident, they could increase the narcotics quantity involved in future transactions.

e.     Rogelio asked UC-1 and UC-2 about the price per kilogram of cocaine. UC-1 responded that the price was $26,000 per kilogram of cocaine and

that this price included the cost of transporting the cocaine to the location of the sale. Rogelio told UC-1 that he wanted to purchase the cocaine for $25,000 per kilogram so that Rogelio could make a profit. UC-1 agreed to lower his price to $25,000 in the interest of conducting long-term business with PERALES, Rogelio, and their Houston-based associates.

f.      Rogelio asked about the purity of the cocaine that UC-1 and UC-2 would be providing. UC-2 responded that the cocaine was high quality, with a purity level ranging from 92 to 96 percent. Rogelio told UC-1 and UC-2 that he was comfortable with that purity level.

g.      PERALES, Rogelio, UC-1, and UC-2 discussed the logistics of transporting the cocaine to Houston, Texas. PERALES and Rogelio said that they needed at least two days' notice before the narcotics shipment arrived so they could secure payment and make any other necessary arrangements. Rogelio said he would be responsible for securing the money for the cocaine, and PERALES added that he, too, would be present at the transaction. UC-1 told PERALES and Rogelio that they would need to make a $5,000 payment before the cocaine would be shipped to Houston, Texas; that the $5,000 payment would secure the shipment and cover the costs of the driver who would be delivering the cocaine; and that UC-1 would provide Rogelio with the necessary bank account information so that Rogelio could make the deposit. PERALES and Rogelio assured UC-1 and UC-2 that they would make the $5,000 deposit.

h.      UC-1, UC-2, PERALES, and Rogelio agreed to meet the next day so that UC-2 could "flash"—i.e., show—PERALES and Rogelio one kilogram of cocaine.

**On or about April 23, 2015, PERALES and Rogelio Again Meet with UC-1 and UC-2 To Discuss the Proposed Narcotics Transaction.**

7.      On or about April 23, 2015, at approximately 3:30 p.m., UC-1, UC-2, PERALES, and Rogelio again met at the Bassett Center Mall, 6101 Gateway Boulevard West, El Paso, Texas. This meeting was consensually audio-recorded. According to UC-1, UC-2, and the audio-recording, during this meeting:

a.      UC-1 walked with PERALES and Rogelio to UC-2's vehicle. Once there, UC-1 opened a passenger door of the vehicle and asked Rogelio to sit inside the vehicle in order to view one kilogram of cocaine. Rogelio did so, and then proceeded to cut open a package containing one kilogram of cocaine in such a manner so as to expose the cocaine. Rogelio then took several pictures of the cocaine, explaining that he needed to show the pictures to his boss.

b.      Rogelio asked UC-1 to use the William P. Hobby Airport in Houston when arriving for the narcotics transaction rather than the larger, international airport that services Houston. Rogelio explained that he lived only 10 minutes away from the Hobby Airport.

c.      UC-1 provided Rogelio with the bank account information needed to make the $5,000 deposit that UC-1, UC-2, PERALES, and Rogelio had discussed the previous day. Rogelio indicated that he would make the deposit once he returned to Houston the following day.

***On or about April 27, 2015, PERALES Informs UC-1 that the Houston Narcotics Transaction Would Not Go Forward.***

8.    On or about April 27, 2015, UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES told UC-1 that his Houston-based associates would not deposit the $5,000 that UC-1 had requested, but that PERALES had a Chicago-based associate who was interested in purchasing 10 kilograms of cocaine from UC-1 and who was willing to make the deposit.

***On or about April 27, 2015, Through on or about May 1, 2015, PERALES and VILLARIAL Arrange a Narcotics Transaction to Take Place in the Chicago Area.***

9.    On or about April 27, 2015, at approximately 7:41 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES told UC-1 that:

a.    PERALES had spoken with Chicago-based associates who had agreed, by midday tomorrow, April 28, 2015, to make a deposit of $5,000 in the same bank account that UC-1 had previously identified for Rogelio to cover the cost of transporting 10 kilograms of cocaine to Chicago;

b.    PERALES's Chicago-based associates "are ready," meaning that PERALES's Chicago-based associates were ready to purchase cocaine from UC-1, and when PERALES had previously spoken to his Chicago-based associates, PERALES had told them that UC-1 would send "10 girls," meaning 10 kilograms of cocaine, to Chicago;

c.      PERALES's Chicago-based associates were ready with "the papers," meaning money for the cocaine; had enough "papers [money]" for "30 [kilograms of cocaine]"; would eventually want to purchase "50 [kilograms of cocaine]"; but they would start with "10 [kilograms of cocaine]";

d.      PERALES's Chicago-based associates were good and professional; and

e.      PERALES would confirm that his Chicago-based associates had made the "deposit [to cover the cost of transporting the cocaine to Chicago]" the next day.

10.      On or about April 28, 2015, at approximately 1:26 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During that conversation, PERALES told UC-1 that his Chicago-based associates intended to deposit $4,500 to cover the cost of transporting the cocaine to Chicago, but that $500 had "escaped," meaning that PERALES's associates were $500 short. PERALES told UC-1 that his Chicago-based associates would deposit the remaining $500 at a later date. Finally, PERALES told UC-1 that he would call UC-1 again once the deposit had been made.

11.      On or about April 28, 2015, at approximately 2 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES told UC-1 that the $4,500 deposit had made. UC-1 then asked PERALES to give UC-1 time to confirm the deposit. PERALES agreed to give UC-1 time, but added that his

8

Chicago-based associates were "ready with the papers [had the money to pay for the cocaine]." PERALES further told UC-1 that "we are going to work beautifully," referring to himself and UC-1.

12.    On or about April 28, 2015, law enforcement confirmed that earlier that day, between approximately 1:30 and 2:30 p.m., $4,500 had been deposited into the same bank account for which UC-1 had previously provided PERALES and Rogelio information.

13.    On or about April 28, 2015, at approximately 11:15 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation:

    a.    UC-1 told PERALES that UC-1 had confirmed the $4,500 deposit and that the driver who would be delivering the 10 kilograms of cocaine to Chicago would leave the El Paso, Texas, area the next day.

    b.    PERALES asked UC-1 whether PERALES would receive a portion of the money that UC-1 was paid for the 10 kilograms of cocaine. UC-1 responded by asking PERALES what his Chicago-based associates were paying PERALES. PERALES told UC-1 that his Chicago-based associates were likely sending the cocaine up north, meaning that PERALES would not be paid by his Chicago-based associates for brokering the narcotics transaction with UC-1. PERALES added that he has known his boss since 2000, and that his boss did not treat him well. PERALES told UC-1 that in the past, PERALES had coordinated

narcotics loads of 110 kilograms and more for his boss, and that PERALES was the one who showed up for the transactions rather than his boss.

    c.    UC-1 asked PERALES what price his Chicago-based associates had agreed to pay for UC-1's cocaine. PERALES told UC-1 that PERALES had set the price at "30 [$30,000 per kilogram of cocaine]" and that his Chicago-based associates would sell it for "31 to 32 [$31,000 to $32,000 per kilogram of cocaine]," so that they could make a profit.

    d.    PERALES told UC-1 that when UC-1 arrived in Chicago, UC-1 could speak with PERALES's Chicago-based associates to discuss future narcotics transactions. PERALES added that his Chicago-based associates would have "papers [money]" for "50 [kilograms of cocaine]."

    e.    PERALES told UC-1 that PERALES was currently in Phoenix, Arizona.

    14.    On or about April 29, 2015, at approximately 12:34 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, UC-1 told PERALES that the 10 kilograms of cocaine had departed for Chicago from the El Paso, Texas, area, and that the cocaine would arrive in the Chicago area the morning of Friday, May 1, 2015. PERALES told UC-1 that PERALES was trying to find a flight to Chicago. UC-1 asked PERALES for the telephone number for one of PERALES's Chicago-based associates, but PERALES said he did not have that information yet.

15.     On or about April 29, 2015, at approximately 4:13 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES identified one of his Chicago-based associates as "El Bale"—later identified by law enforcement as RUVEN VILLARIAL[4]—and told UC-1 that the phone number for "El Bale" was (773) 220-XXXX (hereafter, the "Villarial Phone"). PERALES described VILLARIAL as "the main guy." PERALES also said that he had previously spoken with VILLARIAL, had told VILLARIAL that "the worm [load of cocaine]" was en route to Chicago, and that PERALES would be giving VILLARIAL's phone number to UC-1. Finally, PERALES told UC-1 that PERALES would leave Phoenix, Arizona, at 7:40 p.m. on April 30, 2015, on a direct flight for Chicago, and that PERALES's flight would arrive in Chicago at 11:30 p.m. on April 30, 2015.

16.     On or about April 30, 2015, at approximately 1:15 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES confirmed that he and VILLARIAL would meet UC-1 on May 1, 2015 at a location in the Chicago area that would be determined. PERALES also told UC-1 that VILLARIAL would pick up PERALES from the airport when PERALES arrived in Chicago later that night.

17.     On or about April 30, 2015, at approximately 6 p.m., UC-1 and VILLARIAL, who was using the Villarial Phone, had a consensually recorded

---

[4] Law enforcement identified VILLARIAL following his May 2, 2015, arrest described below.

telephone conversation. During this conversation, VILLARIAL confirmed that he was ready for the next day's transaction.

***On or About May 1, 2015, PERALES, VILLARIAL, and GONZALEZ Meet with Undercover Law Enforcement Officers in the Chicago Area To Discuss a Potential Narcotics Transaction.***

18.     On or about May 1, 2015, sometime in the morning, UC-1 and VILLARIAL, who was using the Villarial Phone, had a consensually recorded telephone conversation. During this conversation, VILLARIAL again confirmed that he was ready to proceed with the narcotics transaction that PERALES had discussed previously with UC-1.  In a later conversation that morning, which was also consensually recorded, UC-1 asked PERALES to contact UC-1 once PERALES and VILLARIAL were near I-55 and Route 83, at which point UC-1 would tell PERALES and VILLARIAL where exactly UC-1 was located. On or about May 1, 2015, in the early afternoon, PERALES, who using the Perales Phone, contacted UC1, and UC-1 told PERALES that UC-1 was at a McDonald's restaurant located at 10 South 710 Kingery Highway, Willowbrook, Illinois.

19.     On or about May 1, 2015, at approximately 1:30 p.m., UC-1 and UC-2 met with VILLARIAL, PERALES, and an unknown male—later identified by law enforcement as MIGUEL GONZALEZ, in the parking lot outside of the McDonald's restaurant located at 10 South 710 Kingery Highway, Willowbrook, Illinois.[5] During this meeting, which was consensually audio-recorded, UC-1 contacted a third

---

[5] During this meeting, UC-1 recognized the voice of the individual believed to be VILLARIAL as the user of the Villarial Phone. Law enforcement identified GONZALEZ following his May 2, 2015, arrest described below.

undercover law enforcement officer ("UC-3"), and asked UC-3 to drive to the McDonald's with 10 kilograms of cocaine so that the undercover law enforcement officers could show the cocaine to PERALES, VILLARIAL, and GONZALEZ.

20.     On or about May 1, 2015, at approximately 1:48 p.m., UC-3 arrived at the parking lot of the McDonald's restaurant where UC-1, UC-2, VILLARIAL, PERALES, and GONZALEZ were meeting. Shortly after UC-3's arrival, UC-2 and GONZALEZ walked from the location in the parking lot where they had been meeting with UC-1, VILLARIAL, and PERALES, and approached the undercover law enforcement vehicle in which UC-3 had arrived. The meeting with UC-2, UC-3, and GONZALEZ was consensually audio-recorded. During the meeting, UC-2 and UC-3 "flashed" the cocaine to GONZALEZ, meaning that UC-3 opened up the rear hatch of the undercover vehicle and showed GONZALEZ a suitcase. GONZALEZ unzipped the suitcase, removed from it one kilogram of cocaine, and asked UC-3 about a stamp that appeared on the surface of that kilogram. UC-3 responded that GONZALEZ would receive the cocaine as-is, at which point GONZALEZ placed the kilogram of cocaine that he had removed from the suitcase back into the suitcase. The suitcase was then placed into the rear hatch of the undercover vehicle. Shortly after the "flash" had occurred, GONZALEZ and UC-2 returned to the area of the parking lot where UC-1, VILLARIAL, and PERALES were located. GONZALEZ told VILLARIAL and PERALES that the narcotics he had just seen looked good.

21.     On or about May 1, 2015, at approximately 2 p.m., UC-1, UC-2, UC-3, VILLARIAL, PERALES, and GONZALEZ departed the McDonald's restaurant after

13

agreeing to complete the narcotics transactions once VILLARIAL, PERALES, and GONZALEZ had obtained the money needed to purchase 10 kilograms of cocaine.

22.     On or about May 1, 2015, at some time in the evening, UC-1 and PERLAES, who was using the Perales Phone, had a consensually recorded telephone conversation. During that conversation, PERALES told UC-1 that VILLARIAL, PERALES, and GONZALEZ would not be able to obtain the money needed for the narcotics transaction that day, but that PERALES would contact UC-1 later in the weekend when VILLARIAL, PERALES, and GONZALEZ were ready to proceed with the transaction.

**_On or About May 2, 2015, VILLARIAL, PERALES, and GONZALEZ Attempt To Take Possession of 6 Kilograms of Cocaine._**

23.     On or about May 2, 2015, at approximately 8:30 a.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES informed UC-1 that PERALES, VILLARIAL, and GONZALEZ were ready to proceed with the narcotics transaction. UC-1 asked PERALES how much money PERALES had, and PERALES told UC-1 that he and VILLARIAL wanted "4" kilograms of cocaine, but were $5,000 short.[6] UC-1 told PERALES that UC-1 would contact PERALES when UC-1 was ready to proceed.

24.     On or about May 2, 2015, at approximately 9:51 a.m., PERALES, who was using the Perales Phone, sent a text message to UC-1. The text message read:

---

[6] Based on the conversation with PERALES described in ¶ 13(c) above, law enforcement believed that PERALES, VILLARIAL, and GONZALEZ had agreed to pay $30,000 per kilogram of cocaine.

"Go ahead and come over to the store," meaning VILLARIAL, PERALES, and GONZALEZ were ready to proceed with the narcotics transaction.

25.     On or about May 2, 2015, at approximately 10:30 a.m., UC-1 sent a text message to PERALES, who was using the Perales Phone. The text message read: "I'm still trying to locate the guy with the keys to the store and I'll let you know," meaning that UC-1 would be in touch when law enforcement was ready to proceed with the transaction.

26.     On or about May 2, 2015, at approximately 10:35 a.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES asked if UC-1 could meet near the same McDonald's restaurant where UC-1, UC-2, UC-3, VILLARIAL, PERALES, and GONZALEZ had met the previous day and whether they could meet before 11:30 a.m. PERALES explained to UC-1 that following the narcotics transaction with UC-1, VILLARIAL needed to go see customers of his in order to sell those customers two kilograms of cocaine. In response to these requests, UC-1 said only that UC-1 would come to a pre-determined location when UC-1 was ready.

27.     On or about May 2, 2015, at approximately 11:42 a.m., PERALES, who was using the Perales Phone, sent a text message to UC-1. The text message read, "Will it still be a[w]hile until you get there." One minute later, UC-1 responded to PERALES via a text message that read: "We're on our way."

28.     On or about May 2, 2015, at approximately 12:15 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded

telephone conversation. During this conversation, UC-1 told PERALES that UC-1 and UC-2 were on their way to meet VILLARIAL, PERALES, and GONZALEZ. PERALES told UC-1 that PERALES had moved from the McDonald's restaurant where the undercover law enforcement officers had met PERALES, VILLARIAL, and GONZALEZ the previous day, and that PERALES was now near a Target Shopping Center located at 7601 Kingery Highway South, Willowbrook, Illinois. UC-1 told PERALES that UC-1 would call PERALES when UC-1 and UC-2 were close to that location.

29. On or about May 2, 2015, at approximately 12:53 p.m., UC-1 and VILLARIAL, who was using the Villarial Phone, had a consensually recorded telephone conversation. During this conversation, VILLARIAL asked UC-1 how much longer it would be until UC-1 arrived to meet with VILLARIAL, PERALES, and GONZALEZ. UC-1 told VILLARIAL that it would be another five minutes. VILLARIAL told UC-1 to head to a Buffalo Wild Wings restaurant, located at 7111 South Kingery Highway, Willowbrook, Illinois.

30. On or about May 2, 2015, at approximately 1:13 p.m., UC-1 and PERALES, who was using the Perales Phone, had a consensually recorded telephone conversation. During this conversation, PERALES asked UC-1 when UC-1 would arrive. UC-1 told PERALES to head to the aforementioned Target Shopping Center in Willowbrook, Illinois.

31. On or about May 2, 2015, at approximately 1:19 p.m., UC-1 and UC-2 met with VILLARIAL, PERALES, and GONZALEZ in the parking lot of the

aforementioned Target Shopping Center in Willowbrook, Illinois. This meeting was consensually audio-recorded; it was also video-recorded by a law enforcement aerial unit. According to those recordings and the undercover law enforcement officers, VILLARIAL arrived at the meeting with PERALES in a black Mitsubishi Montero, and GONZALEZ arrived at the meeting driving a red Ford Explorer. During this meeting, VILLARIAL and PERALES told UC-1 and UC-2 that they wanted "6" kilograms of cocaine, but that they only had enough money to purchase 4 kilograms. UC-1 and UC-2 agreed to give VILLARIAL, PERALES, and GONZALEZ six kilograms of cocaine, with the understanding that VILLARIAL, PERALES, and GONZALEZ would pay UC-1 and UC-2 for the additional two kilograms of cocaine at a later date. During this meeting, GONZALEZ stayed in his Ford Explorer and did not participate in the meeting along with everyone else. But VILLARIAL assured UC-1 and UC-2 that the money needed to purchase the cocaine was in the Ford Explorer and that he, PERALES, and GONZALEZ were prepared to proceed with the transaction.

32.    On or about May 2, 2015, at approximately 1:23 p.m., UC-1, UC-2, VILLARIAL, PERALES, and GONZALEZ left the Target Shopping Center parking lot after the UC-1 and UC-2 instructed VILLARIAL and PERALES to follow them to the nearby truck yard where the narcotics transaction would take place. VILLARIAL and PERALES left in the Mitsubishi Montero; GONZALEZ left in the Ford Explorer; UC-1 and UC-2 left in their undercover vehicle.

33. On or about May 2, 2015, at approximately 1:37 p.m., VILLARIAL, PERALES, GONZALEZ, UC-1, and UC-2, in the three aforementioned vehicles, entered a truck yard located near 1701 Maley Road, in Lemont, Illinois. Inside the truck yard, law enforcement had placed 10 kilograms of cocaine in a trailer. Once inside the truck yard, PERALES, VILLARIAL, GONZALEZ, UC-1, and UC-2 exited their respective vehicles, met, and agreed that UC-2 and GONZALEZ would drive in GONZALEZ's Ford Explorer to the trailer, which was located in a different area of the truck yard. The events in the truck yard were consensually audio-recorded; they were also video-recorded by a law enforcement aerial unit.

34. On or about May 2, 2015, at approximately 1:44 p.m., UC-2 and GONZALEZ arrived at the location within the truck yard where law enforcement had place a trailer containing 10 kilograms of cocaine. UC-2 and GONZALEZ had a conversation while driving to the trailer that continued once they arrived at the trailer. This conversation was consensually audio-recorded. During their conversation:

a. GONZALEZ told UC-2 that VILLARIAL, PERALES, and GONZALEZ were short $5,000. UC-2 asked GONZALEZ if that meant PERALES, VILLARIAL, and GONZALEZ did not have $120,000 with them.[7] GONZALEZ responded that he, PERALES, and VILLARIAL were prepared to pay $123,000.[8]

---

[7] UC-2 was operating on the belief that VILLARIAL, PERALES, and GONZALEZ were prepared to pay $30,000 per kilogram of cocaine, as that was the price PERALES had previously discussed with UC-1 (see ¶ 13(c) above).

[8] Law enforcement believes that in discussions with VILLARIAL, PERALES changed the price from $30,000 per kilogram of cocaine to $32,000 per kilogram of cocaine, so that

b.     Once at the trailer, UC-2 and GONZALEZ exchanged bags. More specifically, GONZALEZ handed UC-2 a bag that GONZALEZ removed from the Ford Explorer that contained a cereal box that, in turn, contained what law enforcement later determined to be $120,330 in United States currency. UC-2 then retrieved from the trailer and handed to GONZALEZ a bag law enforcement knew to contain 6 kilograms of cocaine.

c.     UC-2 placed the bag containing the United States currency in the trailer. UC-2 opened the bag and looked into the cereal box to verify that there was United States currency inside. GONZALEZ placed the bag containing the 6 kilograms of cocaine that he received from UC-2 into the rear passenger side of the Ford Explorer.

d.     GONZALEZ entered the Ford Explorer and cut into one kilogram of cocaine to look at it. GONZALEZ then cut into a second kilogram of cocaine to look at that cocaine as well.

35.     Shortly thereafter, GONZALEZ and UC-2 departed the area of the truck yard with the trailer and returned to the area of the truck yard where UC-1, VILLARIAL, and PERALES were waiting. After UC-2 and GONZALEZ returned:

a.     UC-1 asked GONZALEZ if he was satisfied with the quality of the cocaine. GONZALEZ responded that he had some issues with the consistency of

---

PERALES could make more of a profit on the transaction. At $32,000 per kilogram of cocaine, VILLARIAL, PERALES, and GONZALEZ would have to pay $128,000 to receive four kilograms of cocaine. If they were $5,000 short of that, as GONZALEZ told UC-2, that would mean VILLARIAL, PERALES, and GONZALEZ had $123,000 with them, per GONZALEZ's representation to UC-2.

the cocaine, meaning it was a little soft and not compact on top. UC-1 apologized and said if VILLARIAL and GONZALEZ did not like the quality of some of the cocaine, they could exchange those kilograms for better-quality cocaine at the same time that VILLARIAL and GONZALEZ paid UC-1 and UC-2 money owed for the two additional kilograms of cocaine that VILLARIAL, PERALES, and GONZALEZ were not then prepared to pay for.

b. VILLARIAL told UC-1 and UC-2 that if VILLARIAL could sell two kilograms of cocaine that same day, he might be able to pay UC-1 and UC-2 the money he owed later that same day as well.

c. GONZALEZ's phone rang during this exchange, and GONZALEZ told UC-1, UC-2, PERALES, and VILLARIAL that the individual calling him was an individual interested in purchasing one of the kilograms of cocaine that PERALES, VILLARIAL, and GONZALEZ had just acquired.

36. Following this discussion between UC-1, UC-2, VILLARIAL, PERALES, and GONZALEZ, GONZALEZ drove away in the Ford Explorer, with the six kilograms of cocaine in the rear passenger area. VILLARIAL drove away in the Mitsubishi Montero with PERALES as his passenger.

37. On or about May 2, 2015, at approximately 2:06 p.m., law enforcement stopped the Ford Explorer and the Mitsubishi Montero near the truck yard's front gate. Law enforcement took VILLARIAL, PERALES, and GONZALEZ into custody. At around the same time, law enforcement recovered a bag containing six kilograms

of cocaine from the rear passenger side of the Ford Explorer that GONZALEZ had been driving.

## **CONCLUSION**

Based on the foregoing, I submit that there is probable cause to believe that on or about May 2, 2015, defendants RUVEN VILLARIAL, aka "El Bale," GUSTAVO PERALES, and MIGUEL GONZALEZ did conspire to knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

DOUG ISACSON
Special Agent,
Homeland Security Investigations

SUBSCRIBED AND SWORN to before me on May 4, 2015.

MARY M. ROWLAND
United States Magistrate Judge

21